| | |
|---|---|
| KEITH JAMES SEARS,<br>Plaintiff, | )<br>)<br>) |
| v. | )     O R D E R |
| UNITED STATES OF AMERICA, et al.,<br>Defendants. | )<br>)<br>)<br>) |

On April 4, 2012, plaintiff, a state inmate acting pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983. Compl., D.E. 1. This case is voluminous and has continued for over three years. Defendants Alba, Chavis, Green, Mitchell, and Upton are now before the court with a motion for summary judgment [D.E. 128]. Likewise, in plaintiff's continued pattern he has multiple motions now before the court including two motion for summary judgment [D.E. 133 and 163], a motion for access to the court and dilatory motion [D.E. 159], motion for polygraph test [D.E. 162], motion for protective order, temporary restraining order, and preliminary injunction [D.E. 172], motion to amend and motion to effectuate arrest warrants [D.E. 174], motion to bifurcate [D.E. 177], and motion to appoint counsel (plaintiff's fifth request) [D.E. 179]. In this posture, the matter is ripe for determination.

Plaintiff's Summary Judgment Materials

On or about May 11, 2010, while plaintiff was housed at Central Prison, he was taken to an observation cell by four African-American guards, including defendant Chavis, while the officers were pounding their fists in their hands. Compl., D.E. 1, pp. 17-20, 31-32; D.E. 24, pp. 8-13. Plaintiff then claims that he was beaten by defendant Chavis and the other officers. Id. According to plaintiff, he was pushed into the cell while restrained and was kicked in the head,

back, pelvis, and stomach. Id. Plaintiff claims that defendant Chavis held him down while another officer kicked plaintiff in the neck in attempts to break it; that officers ripped plaintiff's clothes off or bent plaintiff's toes backwards; that officers pinched or pierced plaintiff's wrists deeply; and, that officers twisted plaintiff's handcuffs causing him to bleed or have his wrists gashed. Id. Plaintiff claims that this torture lasted a period of eight days. Id. Plaintiff also alleges that defendant Chavis made racist remarks to him and threatened plaintiff's mother's life and that other officers called plaintiff names or told him to stop fighting his criminal convictions. Id. Plaintiff states that he was threatened by defendant Alba and "Captain White" (now, believed to be either Lt. Upton or Lt. O'Neal) on the same day regarding the incident. D.E. 1, p. 22; D.E. 24, pp. 11, 24; D.E. 112, pp. 14-17. Plaintiff claims that defendant Alba told him that the camera was his lifeline and that if he were to exit his cell he would be killed. Id. Plaintiff showed a Jane Doe nurse his wrists when they were bleeding but she declined to treat plaintiff. Id. Plaintiff claims that he was threatened and prevented from seeking medical care and attending medical appointments. Id.

Plaintiff's allegations were investigated by staff at Central Prison. D.E. 1-1, pp. 4-14. Regarding the alleged excessive use of force, investigators determined that plaintiff had refused orders and assaulted defendant Chavis. Id. at pp. 6, 10. Due to plaintiff's disruptive behavior and noncompliance, force was used to get plaintiff to comply with orders. Id. Regarding his medical care, investigators determined that plaintiff refused medical care while housed at Central Prison. Id. at pp. 13-14.

2

Defendants' Summary Judgment Materials

    i.    First Use of Force Incident, 2:55 a.m., May 11, 2010

Plaintiff was referred to Central from Johnston CI with an involuntary emergency stating the patient was delusional, hyperreligious (preaching)" as well as other noted highly concerning and dangerous behaviors. D.E. 128, p. 18. Thus, on May 11, 2010, at approximately 2:40 a.m., plaintiff was seen by mental health staff for admission to Central Prison's in-patient mental health unit. Upton Aff., ¶¶ 10-11; p. 16. Mental health staff ordered that plaintiff be housed with a mattress and a blanket or smock only. Id. On the mental health unit, this generally means that the inmates are housed without clothing and is done so only for inmates that may be at risk for self-injury. Id. Medical staff make determinations on the in-patient mental health unit as to what property inmates are allowed and correctional staff are only informed of those restrictions and given the responsibility of carrying those restrictions out. Id.

After seeing the mental health staff, at approximately 2:55 a.m., Sergeant Willie Mitchell and Officer Deitrich Moore escorted Sears from a holding cell in the in-patient mental health unit to cell MHW-302. Id. at ¶12; pp. 11-12. When Moore and Mitchell reached the third floor, where Sears' cell was located, they were joined by Officers Carleton Green and Dominic Chavis to assist in placing Sears in his cell. Id. at ¶13; pp. 11-14. Upon reaching the cell, Green ordered Sears to enter the cell and remove his clothing, per the mental health physician's orders. Id. at ¶13; p. 13. Sears refused to enter the cell and stated that he was not going to give up his clothes. Id. Chavis then attempted to gain control of Sears' upper left arm. Id. at ¶14; p. 14. Sears became agitated and actively resisted Chavis, kicking him in the leg three times. Id. at ¶14; pp. 11-14. Moore then gained control of Sears' upper body and Green gained control of Sears' lower

3

body and placed Sears on the cell floor in order to stop Sears' assault of Chavis. Id. at ¶15; pp. 11-14. The officers then removed Sears clothing and exited the cell. Id. at ¶16; pp. 11-14. Mitchell closed Sears' cell door and Green removed Sears' handcuffs through the food passage door. Id.; pp. 11, 14. Mitchell then secured the food passage door and reported the use of force incident. Id.

At approximately 4 a.m., medical staff, Nurse Gladys Odibo, assessed Sears in his cell for any injury following the use of force. Id. at ¶17; p. 15; Odibo Aff. ¶¶ 9-10; p. 6. Odibo noted that Sears had "superficial scratch marks on the inmate's left upper chest wall with slight dry blood, bruises on both sides of his head with bumps/bruises on the lower lip, superficial scratches on both wrists, patient denied any pain." Defts' Mot. Summ J., at 9. The medical screening determined that the injuries most likely occurred during the use of force, but as the result of Sears' continued resistance to the officers. Id. The use of force was not video recorded because the incident was not an anticipated use of force. Upton Aff., ¶18.

Upton was assigned as the investigating officer for the first use of force involving plaintiff and collected witness statements from the staff involved in the incident and Sears. Id. at ¶¶ 9, 19; pp.11-18. Sears admitted that he over reacted and stated that he assaulted Chavis because he was in fear for his life. Id. at ¶ 19; p.18. Sears alleged to Upton that staff had threatened him, but could not name the staff who allegedly did so. Id. Upton ultimately determined that the use of force by correctional staff was minimal and justified, without malicious or sadistic intent, and no more force than necessary was used by staff to stop Sears' assault of Chavis. Id. at ¶ 20. Upton's findings were reviewed and approved by then Warden, Gerald Branker, as indicated by his initials on the incident report. Id. at ¶ 21.

4

ii.  Second Use of Force Incident, 3:05 p.m., May 11, 2010

Later on May 11, 2010, at approximately 3:05 p.m., Sears was escorted from a medical appointment in the Central Prison Emergency Room back to his cell by Sergeant Richard Pickering and Officers William Elderdice, Jameal Jordon, and Vanessa Ritcher. O'Neal Aff., ¶ 10; pp. 9-12. Upon arriving at Sears' cell, the officers assisted him in removing his shoes, socks, pants, and boxer shorts. Id. at ¶ 13. Again, Sears had a standing physician's order for only a blanket or smock and mattress inside his cell. Id. at ¶¶ 11-12. Elderdice helped plaintiff get his shirt over his head and then down to his wrist. Id. at ¶ 13. Sears was handcuffed, thus, the shirt was hanging at his wrist. Id. Pickering ordered Sears to put his hands through the food passage door to his cell, which would put Sears' handcuffs and the shirt on the outside of the cell where Pickering could remove them. Id. at ¶ 14. Sears became agitated and demanded that the handcuffs be removed by staff inside his cell and refused Pickering's order. Id. Pickering again ordered Sears to put his hands out of the food passage door and Sears complied briefly until staff exited Sears' cell and Sears' cell door closed. Id. at ¶ 14. Sears then attempted to resist Pickering and pull his hands back into his cell. Id. Pickering then maintained control of the handcuffs and Elderdice applied the bent-wrist technique to Sears' left wrist and Jordon did the same to Sears' right wrist.[1] Id. Ritcher then removed Sears' handcuffs and the shirt. Pickering secured Sears' food passage door and outer cell door and then reported the use of force. Id. at ¶ 17.

---

[1] The bent-wrist technique is a NCDPS' approved technique which is employed in order to gain compliance from handcuffed inmates who are resisting officers. Id. at ¶ 16.

5

Medical staff, Nurse Laura Brown, assessed Sears in his cell for any injury following the use of force. Id. at ¶ 18; p. 14. Brown noted that Sears had bruising, some swelling in his wrists, and abrasions, but determined that the injuries most likely occurred during the earlier use of force and that Sears did not receive additional injury during the second use of force. Id. The use of force was not video recorded because the incident was not an anticipated use of force. Id. at ¶ 19.

O'Neal was assigned as the investigating officer for the second use of force involving Sears and collected witness statements from the staff involved in the incident. Id. at ¶ 9. Sears refused to make a statement to O'Neal. Id. at ¶ 20. O'Neal ultimately determined that the use of force by correctional staff was minimal and justified, without malicious or sadistic intent, and no more force than necessary was used by staff to bring Sears into compliance with officers orders. Id. at ¶ 21. O'Neal's findings were reviewed and approved by then Warden, Gerald Branker, as indicated by his initials on the incident report. Id. at ¶ 22.

Plaintiff's medical records

Sears was admitted to Central Prison's inpatient mental health unit on an involuntary referral on or about May 11, 2010, and was discharged seven days later on or about May 17, 2010.[2] Odibo Aff., ¶ 11, 13; pp. 7, 15 - 18. On May 11, 2010, Sears' admitting nurse noted him to be paranoid, delusional, irritated, and hyper religious. Id. at ¶ 13; pp. 7, 15 - 18. Sears agreed to have labs drawn during his stay at in-patient mental health, but had refused psychotropic medications, stating that he did not need them. Id. at ¶ 14; pp. 7, 10-12, 44, 46. Sears also had

---

[2]Prior to his admission, Sears' transferring prison Johnson CI reported that Sears was delusional, hyperreligious, and took a light fixture out of the wall in the segregation unit, broke the fixture, and exposed himself to the electrical current, stating that he believed the world was ending. Id. at ¶ 12; pp. 7, 15 - 18.

6

been evaluated by a nurse practitioner for bruising on his head and for complaints related to his wrist. Id. at ¶ 15; pp. 10-12, 51-53. Sears was determined to be free from either head injury and or wrist injury. Id. Sears was observed with clear speech, a steady gait, normal mobility, and without any injury other than superficial bruising and scratches. Id. In sum, Odibo opines that the injuries sustained by Sears related to the May 11, 2010, use of force incident were superficial and de minimis, not requiring continuing care and were consistent with those types of injuries that an inmate in active resistance may sustain due to his resistance to officers and do not indicate any amount of excessive force was used against Sears. Id. ¶ 29.

Upon admission on May 11, 2010, Sears was initially checked every 15 minutes, which was decreased over the period of his admission to allow him to sleep. Id. at ¶ 17; pp. 19-32. Sears' treating physician, Dr. Calnaido, also ordered that Sears only be given a smock and a mattress. Id. at ¶ 14; pp. 7, 10-12, 44, 46. Sears did report to staff that he believed that someone was trying to kill him at times, but at other times was calm and cordial to staff. Id. at ¶ 18; pp. 10-12. Plaintiff stated that he refused to go for his head scan appointment because he felt that he did not need it and that his bruising was resolving. Id. Sears stated that he was aggressive with staff because he was scared and threatened, but medical staff did not observe his behavior as someone who was in fear or threatened. Id.

When presented with the opportunity to travel to UNC hospitals to have his imaging done, Sears refused to go for the imaging. Id. Sears even reported to staff that he wanted to remain at Central Prison for a few weeks because his nerves were fried. Sears was reported to have been uncooperative with his care in the unit and would tamper with the camera in his cell and with his mattress. Id. at ¶ 21; p. 45-47. Ultimately, medical staff could not rule out

7

psychosis as a diagnosis for Sears because of his irritability and unpredictable behavior. Id. at ¶ 22; p. 12. Sears was also diagnosed with a personality disorder. Id.

Summary Judgment

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Where the non-moving party does not respond to a motion for summary judgment, the court must independently review the record to ensure that the movant is entitled to judgment as a matter of law. See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 415–16 (4th Cir. 1993); Meyer v. Qualex, Inc., 388 F. Supp. 2d 630, 634 (E.D.N.C. 2005).

    i.    Qualified Immunity

Defendants assert qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects government officials "where the law is unsettled or murky." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). The test is whether the act was clearly forbidden, not whether in hindsight the action was wrongful. Id. at 286. The Fourth Circuit has recognized a two-pronged qualified immunity inquiry:

> First, we must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003) (internal quotations omitted). In resolving the second step, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), receded from by, Pearson v. Callahan, 555 U.S. 223 (2009). A court has discretion to decide which step of the two-prong test to analyze first. Pearson, 555 U.S. at 242.

    ii.    Medical care

To establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

9

Deliberate indifference requires that a defendant knew of and purposefully ignored "an excessive risk to inmate health or safety . . . ." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "[O]bduracy and wantonness, not inadvertence or error in good faith, . . . characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241. "[T]o establish a claim of deliberate indifference to [a] medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). An inmate is not entitled to choose his course of treatment, see Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam), and mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998).

With the records now before the court, it is clear that Sears was having a mental health episode which required him to be transferred from Johnston CI to Central for mental health evaluation and treatment. Sears was also evaluated and treated for both mental health and physical evaluation resulting from the two excessive force events which occurred on May 11, 2010. The physical examination occurred promptly after the two separate incidents. After the first incident, the nurse noted superficial injuries which appeared consistent with Sears resistance to the officers. After the second incident, the nurse noted injuries believed to have been from the first incident and noted none from the second incident. The nurse found that the injuries were

10

superficial and de minimis and did not require any additional care. The medical records state that Sears himself refused to go to the hospital do to his fragile mental state. Summary judgment is granted for defendants.

    iii.    Excessive force

The Eighth Amendment protects inmates from cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312, 319 (1986) (internal quotation marks omitted); Wilson v. Seiter, 501 U.S. 294, 298–99 (1991); Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Not every infliction of pain is forbidden, however, and prison officials may apply force to an inmate "in a good faith effort to maintain or restore [prison] discipline." Id. at 320 (internal quotation marks omitted). However, where prison officials use force "maliciously and sadistically for the very purpose of causing harm," an Eighth Amendment violation has occurred. Id. at 320-21 (internal quotation marks omitted). Furthermore, the Supreme Court has held "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Wilkins v. Gaddy, ___ U.S. ___, ___, 130 S. Ct. 1175, 1176 (2010). The court must look at "the nature of the force rather than the extent of the injury." Id. "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." Id. at 1178 (citation omitted). It is one factor in applying and reviewing the Eighth Amendment analysis. Id.

In determining whether prison officials have acted maliciously and sadistically, a court should balance: (i) "'the need for the application of force,'" (ii) "'the relationship between the need and the amount of force that was used,'" (iii) the threat reasonably perceived by the responsible officials, and (iv) "any efforts made to temper the severity of a forceful response."

11

Whitley, 475 U.S. at 321 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Not every malevolent touch by a prison guard, later determined in the calm of a judge's chambers to be gratuitous, gives rise to a federal cause of action. Hudson, 503 U.S. at 9 (citing Johnson, 481 F.2d at 1033). Prison officials are charged with balancing competing governmental interests, such as: the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. Whitley, 475 U.S. at 321. When correctional officers use force to keep order, they have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. Hudson, 503 U.S. at 6.

Here, plaintiff has simply failed to demonstrate excessive force, and defendants are entitled to qualified immunity. As stated above, plaintiff had arrived at Central on an involuntary referral due to his paranoid, delusional, irritated, and hyper religious behavior. While he states he was assaulted, it appears to the court that the force was used for compliance purposes and not in a malicious and sadistic manner. Plaintiff was given medical instructions to have his clothing removed given his mental health concerns. Plaintiff resisted in complying and felt his life was being threatened which resulted in two limited and controlled use of force events. There were no significant resulting injuries and while not dispositive of the issue, it is not irrelevant and is supportive of the court's conclusions. See Wilkens, 130 S. Ct. at 1178.

Conclusion

Defendants' motion for summary judgment [D.E. 128] is GRANTED. Likewise, all of plaintiff's pending motions are DENIED [D.E. 133, 159, 162, 163, 172, 174, 177, and 179]. The case is CLOSED.

12

SO ORDERED, this the 13 day of July 2015.

*Terrence Boyle*
TERRENCE W. BOYLE
United States District Judge